We have five cases on the calendar this morning, three patent cases, a dumping case from the Court of International Trade and a Veterans' Appeal which is being submitted on the briefs and will therefore not be argued. The first case is Bruce Saffran v. Johnson & Johnson and Cordes, 2012, 1043. Mr. Diskind. Thank you, and may it please the Court. There are, in our view, many problems with the judgment below. I'd like to focus on two that arise from the means plus function limitation in the claim. Dr. Saffran's invention was, as he described it, the discovery that he could eliminate the drug-containing layer of his prior 262 patent and rely only on the minimally porous layer from that patent by attaching drug with a hydrolyzable bond to the outer surface of the minimally porous layer so that when released, it could only go in the direction opposite the minimally porous layer. He chose to claim that invention in means plus function language. Under this Court's precedent and under the statute, he was therefore limited to the structure adequately disclosed in the specification that was clearly linked to performing that function plus its equivalence. The District Court correctly identified the function to, quote, release a drug preferentially toward the damaged tissue but then failed in two respects adequately to identify the structure. First, I'd like to focus on the structure for release of the drug. Is this your chemical bonds, hydrolyzable bonds thing? The release of the drug is yes. Yes. And the second part of the argument is the affixing to the layer, both components to the means plus function claim. Let me switch you a little bit and ask you about the layer, whether the device is limited to a single layer. In a few places in the specification, it refers to a preferred embodiment or one embodiment, according to one embodiment, a single sheet. So why are you limited to a single sheet? Well, the District Court found that we're limited to a single layer. I think if I can interpret Your Honor's question to be why are we limited to a sheet, our short answer, which we obviously expand on in the brief, is that he calls it a sheet every single time he describes it. Every single illustration has referenced number one. How about the spray? The spray is a sheet. The spray forms a sheet on the body. The spray is shown as reference number one, a sheet. The spray also is an embodiment that was claimed, rejected and then abandoned. But it forms a sheet in the specification. What about the K wire application? It's a sheet. Every single version of this invention as disclosed is a sheet. And I think we've addressed that, I hope, adequately in our brief. I'd like in my limited time, if I may, to turn back to the means plus function, because I just think that's the easiest way out of the case. I have a question about the means plus function. I'm happy to answer all your questions. We'll go back to hydrolyzable bonds if you'd like, but if in fact there's a conclusion that you're correct that there's not sufficient structure, what about the issue of equivalence under 112.6? There's a stipulation in the district court that we do not have hydrolyzable bonds or their equivalent. Or their equivalent. Or their equivalent. That was not tried. It was stipulated. They made a motion on it. They withdrew the motion. The motion was granted. There is no equivalence. So if we agree with you on hydrolyzable bonds, you believe that's the end of the inquiry? That is the end of the case. Which is one of the reasons I thought it was simple and easy to address. What about the sheet? I'd like to go back to Judge Lori's question on disclaimer. So if we were to agree with you that a layer is limited to a sheet, does that end the case? If you were to agree with us that the layer is limited to the sheet and not reach the disclaimer, I'm afraid that would be... What do you mean not reach the disclaimer? That's the only way to get to this. Only through disclaimer can you limit a layer to a sheet. So how would we... If you agree with me, let me state it affirmatively. If you agree with us that the embodiment is a sheet, the patent covers a sheet that must preclude the through passage of drugs... Well, the claim doesn't say a sheet, counsel. So the only way to get to a sheet is to conclude that a layer is limited to a sheet either through lexicography or disclaimer. So suppose that we were to agree that through disclaimer a layer is limited to a sheet, does that end the case? If you were to agree that the layer is limited to a sheet, that, as we contend, must preclude the through passage of molecules through the open mesh pores of a strut, that ends the case. But why do we have to conclude that it limits the macromolecules from traveling through? I mean, a sheet is a sheet is a sheet, and what seems to be sprayed on the backside of a stent pretty much doesn't look like a sheet to me. It doesn't look like a sheet to me either. I think that would end the case, but I think there are a lot of ways to end the case. So are you suggesting that there isn't a stipulation or some sort of ruling below that if a layer is limited to a sheet through disclaimer, then the case is over? There's no stipulation to that. There's no disputed fact to my knowledge. They've never contended that we have a sheet. That's not a disputed fact. They could have attempted to prove that under this Court's case law when you know there's a disputed issue like that and you fail to prove it. This Court has on multiple occasions found that a failure of proof and reversed. There's no effort to prove that they block through passage through the open mesh pores. All of that I would view as undisputed fact that would warrant a reversal. Well, how do you respond to opposing counsel's argument that we don't have to worry about the pores of the stent because what we're really talking about is the strut? That's an argument that has no support in Dr. Safran's disclosure or any proper claim interpretation. Dr. Safran's disclosure, as you'll see from looking at figures 8D, E, F, any of them, the plaque covers the entire area where the stent is placed, not just where the strut is placed. So he's worried about covering that entire area, not just the strut. Well, in that particular embodiment he was talking about covering the entire area because at that point they were talking about treating the plaque. But your device doesn't treat the plaque, correct? It treats the tissue damage, right? Tissue damage is caused by the expansion of a balloon that runs the entire length of the stent. That's how the stent expands. The evidence is that the injury occurs over the entire length. There is no interest by any scientist in just treating the crisscross pattern where the stent hits. Well, their expert testimony that shows that that's where the damage occurs is at each of the struts? I can't say whether their expert said that or not. He might have. The evidence is true that the damage is caused by the entirety of the balloon expanding. But isn't there a factual question as to whether or not a sheet or a layer could be applicable to the strut as opposed to the stent as a whole? If the Court finds that's the interpretation, I think you could pose a factual question like that. Our view is that there is a very clear disclaimer when the device is used with a stent that it must cover the open mesh ports. If the Court agrees with that, then there's no factual issue. Could I just get a moment on the means plus function because my time is limited? I wanted to make two points, at least very quickly, if I could. One is on the chemical bonds that the District Court said were disclosed, that doesn't cut it under this Court's case law. You're talking about any suitable chemical bond. You're talking about the scientists finding the right chemical bond. That is not means plus function disclosure. The question isn't whether one of skill in the art could figure out what chemical bonds would work. The question is whether one of skill in the art would understand the specification itself to disclose the structure. Hey, counsel, what about column nine of the patent where – I'm sorry. I know you want to talk about hydrolyzable bonds, but I don't particularly want to, and I'm just trying to get you to focus on what I want to ask you about. I'm happy. So column nine, right around line 20, when it talks about healing macromolecules can be contained at the site of the injury and medicine applied directly, and then it goes on and talks about the distinction between, say, Scott and Walstent, and then it also talks about that you can even administer antibiotics in a directional manner in a time-released fashion at the site as they are most needed. Why isn't that a disclosure of exactly what you do do, a stint with time-released antibiotics applied? Why isn't that – You're reading column nine, lines 20 – Anywhere from 20 through 36, sure. Why isn't that a disclosure that his invention, his discovery extends to exactly what you do? I read this as actually disclaiming that. If you read the parenthetical on 25 through 30, basically he says this invention, if manufactured as a stent – So clearly he contemplates his invention being manufactured as a stent. Yes. Which is not a sheet, right? A stent by definition has this accordion-like whole configuration. I think I would read – he drafted this himself, Your Honor. I think I would read this in context with his other more extensive stent disclosures. History is more like a journal paper than a patent application, isn't it? Absolutely. But if you read it in context with his actual stent disclosures, I think what he's talking about is coding the stent with his device, and he identifies the flaws in the stents. Current state-of-the-art stents have porous meshes which don't block anything, or they do have containment means like SCOT, which does block but doesn't block it adequately. His invention is an advance over both of those because – Wait, but he also says they do not have macromolecule containment means and or directional delivery means. So he's saying another problem with the prior art is they don't have directional delivery means, which is what he says he's created. And then a little further down, he says, one can administer antibiotics in a directional manner in a time-released fashion at the site as they are most needed. Isn't that exactly what you do? We do do deliver directional release at the site, but we don't do it through a sheet. We don't do it by blocking the open mesh pores. We don't do it by hydrolyzable bonds. We don't do it by affixing drug to the surface of our layer. So, yes – Well, you do it by affixing drug to the surface of the stent. Yes, but the claim is on a layer of flexible material. The contended device – Well, the stent is flexible material. The device that was contended at trial – the only device that they contended infringed was the layer, not the stent itself. There was no contention in the trial record that the stent infringed. The allegations of infringement were all about the polymer layer on the stent, which was contended to be Dr. Safran's layer. Well, once you put that layer onto a stent, isn't it flexible? I didn't understand the dispute to be whether or not the layer itself was flexible on appeal. The layer is flexible. We did not dispute that the polymer layer was flexible. That doesn't seem to be, as Judge Moore said, a disputed issue. That was not where we were. You're into your rebuttal time. Do you wish to save it? Can I make one point before I sit down? Your time. Because I didn't have time to get to the other part, which is the structure for directionality is a fixing drug to the surface of a minimally porous layer. He says that 25 times in the specification. That is the only directionality that's provided. The drug bounces off the minimally porous layer and goes in the direction of the wall. Is it your position that if it's internal to the layer, that somehow it won't go in the direction of the injury? My position is that a means plus function, where you're looking at structure that's disclosed in the specification, the only structure that's disclosed in the specification is attaching it to the layer. This is not a claim construction issue. This is a means plus function claim, which he's obligated to disclose structure in the specification for achieving the function. And he has limited that structure in its equivalence. The structure that's disclosed is attaching drug to the surface. But as a matter of science, your position is that because it's attached to the surface of the minimally porous layer, it necessarily goes in one direction. That's his invention. That's exactly what he disclosed. He claimed it in means plus function language. The district court erroneously failed to construe it that way. They can't meet that limitation. This has another reason to reverse. Thank you. We'll save the remainder of your time, Mr. Fisker. Mr. Frederick?  May it please the Court. Dr. Saffron invented a device with very specific properties for releasing drug into the body. First, when placed adjacent to damaged tissue, it had to directionally release treating material toward the tissue. The patent makes clear the chemical bonds. Do you mind if we start with a disclaimer? I'd like to know why we shouldn't construe the layer as limited to a sheet. Well, in column 13, he explains that what he means by a sheet is a very thin layer. So he uses the word layer in the claim. And in column 13, and this is at lines 59 to 60, he says it is a single thin layer of material. I don't understand how that helps you. A sheet is a layer and a layer is a sheet. Because what we're concerned about is where is the sheet layer on the device as it interfaces or makes contact with damaged tissue. The evidence is undisputed here that the only place the damaged tissue arises with a stent as it expands is the place where the stent strut makes contact with the arterial wall. That's where the damage occurs. It occurs because of the expansion of the stent strut. That's why the sheet layer material has a drug that directs preferentially toward that spot. I'm still not following you. Are you acknowledging and accepting the fact that the word layer as used in the claim is limited to a sheet? Well, I'm saying that that's the preferred embodiment. But there also are disclosures about film coating. That's in column 19. But why isn't that simply a sheet also? Because the figure of 5D, which shows the film coating around an intramedullary rod, is virtually identical to the coating around the stent struts that they have in their device. At appendix 1100, don't you have a disclaimer? The device used is a sheet. The device is a single layer rather than two layers. Isn't that pretty conclusive as far as your case is concerned? No. Why not? Because it's important to look at what are the qualities of the sheet layer. First, sheet is not used in the claims. So it's construing the claims, you construe the word layer. And the issue is what did Dr. Sapper... You're construing the word device. No. The device is in the claims. Yes, that's true. But the device was construed as encompassing all the limitations of the claim. Here, the question is... The question is whether that was wrong or not. Well, I don't think that they make a serious argument advancing that because what they're really arguing here is that layer is limited to sheet. Sheet is clearly a preferred embodiment. But film coating, spray are also disclosed. But don't they create a sheet? Not over the open spaces. Column 8 says that the sheet layer can be done regardless of pore size. But your accused device is limited to the strut, not the stent. The layer on the strut. That's correct. The layer on the strut. We're talking about the layer that includes the polymer and the drug. It's on the strut. But at 8488, you say, in response to a rejection, the argument claims the above claims, which include the ones you're discussing, the above claims to find a novel device and method of treatment over the prior art as follows, semicolon. The device used is a sheet rather than a preformed chamber. Yes. So that's it. Your device used in those claims is a single sentence. In your prosecution history, it's a sheet. No, well, I think it's important to understand what the properties of the sheet are. If you spray paint on a chain link fence, you create a sheet of paint on just the metal parts of the fence. But you have no disclosure that does that in this specification. Your disclosure of sheet is always a sheet. Your spray on, you spray directly on the injured site in the column when you disclose spray on. So it's hitting every single point on that surface, not a stent that's on top of the surface and then put in place. But at the bottom of column 12, it's disclosed that the invention is formed when the spray hits a solid surface. The invention is not formed in open space. Right, but the only solid surface that you disclose the spray hitting is the injured site, which is the entire portion is a sheet. You don't talk about spraying on a stencil and then putting the stencil in place. You talk about spraying directly on the house. Therefore, the whole house is getting painted. Yes, but the words that are used is a solid surface, which can include a fixable device, which is also asserted in Claim 18, which was found to have infringed here. So we're talking about a layer with properties, and the property that's most important here is whether or not it is necessary to restrain endogenous macromolecules. What they assert is that the reason why this sheet has to cover the open pores of the stent is that somehow it's required to restrain all endogenous macromolecules. That is not what the claim says. The claim says at least one macromolecule. Okay, wait. Do you agree that the device is limited to a sheet in light of this prosecution, but you're claiming there's a distinction between layer and sheet? Is that right? Am I understanding your argument? Yes. Okay, wait. Now, let's look at the claims themselves, if that's your argument. Because Claim 1, the very last element, says the device, which you've just admitted, is nothing but a sheet, the device being capable of substantially restricting the through passage of at least one type of macromolecule. Well, their stent has micron-sized holes. It can't possibly restrict the through passage of a single macromolecule. That's not correct. The serolins, once it's released, does not come back through. 90% of it goes in. That means 10% goes back. That's the evidence of record. There's nothing that says 100% of it goes through. Nowhere. That's true. Which means the other 10% is going somewhere. Guess where it's going? Through the holes and back on out. No, it's actually going into the bloodstream. But the evidence was clear on this. This was unrefuted. And Dr. Freeman testified that once the serolins is released from the layer into the tissue wall, it does not go back through the layer. This is important, because that is the macromolecule that is restrained by the layer. It is the serolins. Let's go back to the claim language. The sheet, because you said device is limited to a sheet, which it has to be based on the prosecution history. The sheet, the sheet being capable of substantially restricting the through at least one type of macromolecule. Yes. Well, how is their sheet restricting passage of a macromolecule? Under your prior question, 90% is substantially restricting. That is not going back through the layer sheet. And that is a macromolecule. It's undisputed. Serolins is a macromolecule. How is the sheet doing that? The sheet is doing it through the chemical properties and linkages that are disclosed on column six between lines 36 and 40, where what it says there is that if you have the right chemical bonds and linkages, you can use them for restraint and release. And that is exactly the way the cipher stent layer operates. It restrains the drug through hydrophobic interactions that are released preferentially toward damaged tissue only once the stent is placed at the affected tissue. I don't see how it could be a sheet. You know, a sheet to me doesn't have giant holes in it. It's like saying a picket fence is only the struts. Well, Judge Moore, that's what I'm saying. There are holes in between. The dog can still go through those holes. Well, if you were to charge that fence with ionic charges, for instance, and you were to throw metal ball bearings through it, they wouldn't get through if the charge was strong enough. The whole point is to look at the qualities and properties of the sheet layer, and that's something that they want you to avoid. The testimony here was quite clear that if the material has the appropriate chemical bonds and linkages, it can both restrain drug, release drug preferentially once it is adjacent to the damaged tissue, and keep it from coming back through the layer. And that is what the infringement is. But you didn't invent restraining via adhesive on the underside of the stead. There's no disclosure of anything like that in this patent. The restraint is always through a sheet, like saran wrap, or something that's preventing the molecules from getting back through. Judge Moore, I would just ask you to open your view about what a sheet is by looking at the qualities and properties that it has to do. It has to restrain at least a macromolecule. It has to be contained in a minimally porous material. No, but I don't get to do that. Don't look at the properties. A sheet is a structure. You've defined a structure here. It's being structural. I don't get to say anything at all that performs the function that is identical to the structure you've claimed you get. No, but let's keep in mind the confusion that they've introduced about means plus function. Because when we're talking about the minimally porous material, we are talking about properties of the material. Now, the means plus function confusion that they seek to introduce is to have that part of the claim imported into the material release means. That is completely improper under the Wanger decision of this court. And what they are seeking to do is to take- But the release means there has to be a structure. It has to be a disclosed structure under 112.6. Now, do you agree that the accused device does not use hydrolyzable bonds such that if you are limited under 112.6 to hydrolyzable bonds, that that's the end of the inquiry? There was a dispute about the equivalence, Your Honor, so that if you were to find that there is only a limit to hydrolyzable bonds, which we don't agree with because column 15, line 1, says any suitable chemical bond. And the testimony was clear that hydrophobic bonds and interactions are suitable chemical bonds. But if you don't agree with any- What's a hydrophobic bond? That's my chemistry's way out of date. Hydrophobicity relates to being antagonistic to water. Yes. Rather than being a bond like a covalent bond or an ionic bond or a hydrogen bond. What's a hydrophobic bond? Well, this was explained at trial, and Dr. Freeman's testimony goes into this. He testifies, and this is- Is he a chemist? He's a chemical engineer. Chemical engineer. Yes. He's a Ph.D. chemical engineer. Quite a brilliant man, too. On pages 24, 7, 36 to 37, he's asked, and is the hydrophobic bonding- Are they, in fact, chemical bonds and linkages? Answer, yes, that is correct. Question, are they also, in fact, equivalent to chemical bonds and linkages? Answer, yes, sir. Now, in the amicus brief by the chemist, they point out that in 1995 when this patent was being used, that there was a different way of understanding chemical hydrophobic bonds and that it was often used as a way- More like interactions, not bonds. That's correct. So if we were looking at this from a kind of current linguistic point, what Dr. Freeman is saying is that they are the equivalent to chemical bonds and linkages. And certainly, the way the polymer- Are you saying there was not a stipulation? I'm saying we dispute what he just said, that there is, in fact, the case would be over. No, no, no. What he said was the case would be over because there was a stipulation that there were no equivalents thereof. We do not agree with the breadth of his statement. All the stipulation- All right, why is there a stipulation? What the stipulation went to was the extent of his testimony comparing hydrophobic releases and hydrophilic- Tell me what the stipulation said. I just read what the point was. Can you tell us where it is? Yes, it's the- This testimony is at 2473- No, the stipulation. I don't care about the testimony. I want to know where the stipulation is. I'll have to get one of my colleagues to help me get that. But we do not agree that the case would be over if you were to find that it's only hydrolyzable bonds. And we also would take strong issue with the concept that you can introduce that kind of limitation in a means plus function standard because it would mean that chemists would have to identify every single little bond that would apply, where here there's clear disclosure of hydrophobic- But they just don't have to use means plus function claiming. I mean, there are ways around this, right? Yes, but there's not any dispute that this is a proper thing to do here. He's used means plus function language, and that's not disputed that he's allowed to do that. What they want to complain about is that they have additional structures that they want to import from the specification and from other claim language, which is clearly contrary to this Court's precedent. Well, it still has to be, even without importing anything else, it still has to be a release, and it has to be directionally released, right? Correct. So what's the structure that causes the directional release? Those are the chemical bonds and linkages as they are interfacing with the particular environmental milieu in which they are facing damaged tissue. So, for instance- But aren't the only specific ones in the specification hydrolyzable bonds? Not entirely. Specific ones? The specific ones are hydrolyzable bonds, Your Honor, but he also describes, and this is at column 8, lines 45 to 48, directional delivery of treated energy, e.g. radio frequency, in a directional manner simply by coating the invention with an energy sink on the side away from the tissues that you wish to treat. He explains into solution directional delivery and in situ and into fragmentary space. That's at column 8, line 40 to 42. You're running out. Do you have any final points you want to make? I'm happy to answer whatever questions you have in my time because this is obviously a very important case, not only for Dr. Saffron who spent an enormous amount of time coming up with this invention, but also because of the importance that this directional delivery has. The point about the disclosures is key. The court found, and the expert testimony was clear, that using chemical bonds and linkages for directional delivery in damaged tissue is a major advance and that it's not limited to hydrolyzable bonds and they are, in fact, what is happening with the sirolimus drug. It is directing preferentially at the point of damage because of the interaction between the hydrophobicity of the lipid cells and the drug. If the court has no further questions. Thank you, Mr. Frederick. Mr. Diskant used most of his time, but we'll give you two minutes to rebut. First, to answer a few direct questions, Judge O'Malley, you asked about the stipulation about hydrolyzable bonds. If you look at A6565 of the appendix, is our motion to bar evidence that Saffron argued that hydrophobic bonds are the equivalent to hydrolyzable bonds. That's at A6565. Our brief, that motion was granted by agreement. The order granting it is miscited in our appendix, but I'll get it for you. I'm sorry. Well, there's a problem in that part of it is that your blue brief has a miscitation. Yes, that's what I was just saying. So what's the actual citation? We don't have the actual citation, but I will provide it. I don't believe the order is in the appendix, so we will get you a copy. I'm sure you have no objection to amending the appendix. So I'm sorry. So you're telling me that the appendix doesn't have the stipulation that you're referring to? The appendix has our motion seeking that relief, which I just cited to you at A6565. And that motion was granted by stipulation, and the order granting it is not in the appendix, but I will provide it to the court. OK. And I apologize for the error in the citation. Do you know the docket number at the district court for the stipulation? I don't have it handy. I apologize. I will get it to you today. If we were to limit this device layer to the sheet, what happens? I don't have a clear picture of what we do at that point. We just vacate and remain, let the trial court start over? I would vacate and reverse, because I don't think that, like you said, it's not covered by a sheet.  covered by a sheet. And creative advocacy doesn't turn the little polymer on the spreadsheet to a sheet. Isn't it possible that the lower court could decide, or a fact finder could find, that what you do have that covers your device, your stent, is the equivalent of a sheet? I think, in light of the disclaimer, that's impossible. But part of it turns on how far the court goes in its decision. If the court simply says it's a sheet and full stop and throws it out there, I think we should be entitled to summary judgment, because a fact finder couldn't find that. But if the court went a step further and said it's a sheet, and furthermore, a plainly disclaimed use of his device on a stent, unless it covers the open mesh pores of the stent, then there wouldn't be any dispute at all. But you really need that additional piece in order to say that this is a decision. That drives a stake into the claim, for sure. Another correction I just wanted to make on directionality. I heard counsel say directionality was caused by the chemical bonds interfering with the environment. Judge Ward corrected his claim construction at A48 to make it clear that the structure of chemical bonds and linkages is referring to the chemical bond or linkage between the drug and the device. So basically, the question is, does what they call hydrophobic bonds and the device provide any directionality? And of course, the answer is no. That's the same as in any prior art drug delivery system. You have hydrophobic and hydrophilic compounds in the drug releases. But as with Scott, it would go in either direction. Unless there was, as in saffron, a minimally porous sheet to which the drug was attached, forcing it in the opposite direction. I see my time is up. There are many, many problems with this case. It is a very large judgment. It is, in our view, a very significant injustice to our client. And I'd ask the court to pay close attention to all the issues. There are many grounds for a complete reversal. We will do that. Thank you. Mr. Discant, the case will be taken under advisement. Thank you.